Honorable Richard Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>    v.<br><br><br><br>JOSEPH WILSON,<br><br>                  Defendant. | No. CR18-132 RAJ<br><br>DEFENDANT WILSON'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)<br><br>Noted:  July 31, 2020<br><br>**Oral argument requested** |

**Motion**

Joseph Wilson, age 42, moves for a court order directing the Bureau of Prisons to immediately release him from custody.  He seeks compassionate release based on his recent diagnosis of the coronavirus, his continued virus-related symptoms and chronic underlying health issues, and the inability of his institutional custodians to adequately treat and protect him or provide a safe and sanitary environment for his recovery.  The facility where he is incarcerated – FCI Lompoc – has one of the highest rates of infection of all federal facilities in the country.  It cannot protect him and those around him to the same extent he could shield himself if released to stay with his fiancé at her residence in Seattle.  Moreover, the medical records the BOP has produced document his COVID

diagnosis and ongoing symptoms of high blood pressure, shortness of breath, and gout, among other ailments that make him particular vulnerable to the ravages of the Covid-19 virus.

Mr. Wilson has satisfied the administrative exhaustion requirements needed to bring this motion. His written request to the Warden at Lompoc in April 2020, when he was experiencing symptom of Covid-19 was denied in writing on May 26, 2020, shortly after he was actually diagnosed with the virus. See Exhibit 1.

**Mr. Wilson's sentencing and medical condition prior to Covid-19**

On October 25, 2019, this court sentenced Mr. Wilson to 72 months imprisonment for his role in a large conspiracy to distribute controlled substances and for possession of a firearm while acting in that role. He is now serving that sentence at FCI Lompoc. He has been in custody since his arrest on June 6, 2018, and, according to the BOP website, has a projected release date of July 17, 2023. Thus, he has served over 40% of his time.

At the time of his sentencing, as documented in the PSI and in the statement of his treating physician at Harborview Medical Center[1], Mr. Wilson suffered from the painful and uncomfortable aftereffects of a 2017 automobile accident that left him with a broken neck, a fractured spine, a collapsed lung, and broken ribs. He has had gout since 2015 and problems with high blood pressure, also noted in the

---

[1] Exhibit 2

PSI.

Once at Lompoc in November 2019, other health problems were documented, including two lingering conditions from his auto accident: post-traumatic stress syndrome and arthropathy (joint disease) in his cervical and thoracic spine.

### COVID-19 strikes BOP facilities, particularly FCI Lompoc

A few months after his BOP placement at FCI Lompoc, and with little warning, the COVID-19 pandemic descended on the country and world at large. As of this writing, the *New York Times* reports that over 3.7 million Americans have been infected with the virus and over 140,000 of them have died from it.[2] COVID-19 is deadly, with a mortality rate estimated between three and four percent, a rate far higher than that for influenza, and for which no current vaccine or effective treatment exists.[3]

The pandemic has moved with particular virulence against the Lompoc prison complex. As reported in the *Santa Barbara Independent* on May 13, 2020:

> The COVID-19 time bomb ticking inside the Lompoc prison complex since late March detonated in dramatic fashion this week as the

---

[2] New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, updated July 20, 2020

[3] World Health Organization, Q&A: Similarities and differences – COVID-19 and influenza, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-similarities-and-differences-covid-19-and-influenza? (Mar. 17, 2020).

federal facility confirmed 912 open cases among inmates and 25 cases among staff.  The outbreak remains the largest in any federal prison in the United States.

## The Class Action Lawsuit Against Lompoc Complex

In the midst of this escalating medical catastrophe the ACLU instituted a class action lawsuit seeking immediate injunctive relief for the inmates at Lompoc. The inmate class was certified and the injunction granted.  See *Torres v. Milusnic*, CDCA No. CV20-4450-CBM-PVC(x), Order Re: Plaintiff/Petitioners' Motion for Preliminary Injunction, dkt #45, dated July 14, 2020.  Exhibit 3. Citing supporting medical authority, the injunction notes:

COVID-19 is a novel, highly infectious virus that has been declared a global pandemic and resulted in lockdowns of entire countries around the globe to stop the spread of the virus.  There are over 2 million confirmed cases of COVID-19 and over 130,000 related deaths in the United States, and over 271,00 confirmed cases and over 6,300 reported deaths in California.  The medically vulnerable are at higher-risk of suffering severe illness or death from COVID-19. Per the CDC, COVID-19 is thought to be transmitted from person to person mainly through respiratory droplets, and social distancing "is a cornerstone of reducing transmission of respiratory diseases such as COVID-19" but "is challenging to practice in correctional and detention environments."  *Torres.* at 17.

The virus has spread among inmates at Lompoc—859 inmates at FCI Lompoc and 170 inmates at USP Lompoc have tested positive for COVID-19 or have been deemed "recovered" by the BOP and four inmates at Lompoc have died. The physical configuration of the facilities at Lompoc — dormitories, multi-person cells, open configurations, community restrooms, and units/rooms shared by 8-10 person rooms — precludes meaningful social distancing. *Id. a*t 17.

COVID-19 spreads mainly among people who are in close contact (i.e., within approximately 6 feet) and therefore limiting close contact with others is the best way to reduce the spread of COVID-19. *Id.* at 4.

COVID-19 spreads very easily and sustainably between people and more efficiently than influenza. Anyone can contract COVID-19 and spread it to others. Recent studies indicate people who are infected with the novel coronavirus but do not have symptoms likely also play a role in the spread of COVID-19. *Id. a*t 4.

The more closely a person interacts with others and the longer that interaction, the higher the risk of COVID-19 spread. Therefore, the CDC advises that maintaining social distance of approximately 6 feet "is very important in preventing the spread of COVID-19," and "is one of the best tools we have to avoid being exposed to this virus and slowing its spread." Per the CDC, "[s]ocial distancing is especially important for people who are at higher risk of severe illness from COVID-19." *Id. a*t 5.

Individuals of any age who have serious underlying medical conditions are at increased risk for severe illness from COVID-19.[4] Among these conditions are asthma, hypertension or high blood pressure, diabetes, chronic obstructive pulmonary disease, and diabetes. *Id*. at 5.

The court cited the declaration of a recent former FCI Lompoc inmate regarding aspects of the very crowded conditions of the facility. *Id*. at 27. Inmates, up to 40 in number, had to wait in a waiting room designed for ten people when they went "to medical for sick call" and "social distancing was impossible." Inmates had to line up "less than six feet apart in their housing units for pill call." Dorms had long rows of two-man bunks spaced closed together where social distancing was impossible, and inmates had to traverse narrow stairwells shoulder-to-shoulder with other inmates twice a day to pick up meals and bring them back to their housing unit. Inmates were not removed from the housing units and isolated even if they had symptoms like severe coughing unless their temperature was 100.4 degrees or higher. When inmates asked for a replacement for their damaged mask, they were told by correctional staff that they did have any more masks. Inmates did not have adequate supplies of soap; if they showered and washed their hands regularly it would run out in a few days; liquid dispensers at sinks often

---

[4] CDC, Who is at Increased Risk for Severe Illness? People with Certain Medical Conditions, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/people-with-medical-conditions.html (last accessed July 7, 2020).

emptied by lunch time, and inmates were not provided with hand sanitizer. Inmates were not provided with enough cleaning supplies to clean shared bathrooms and housing units, were given watered-downed cleaning solution, and were not given paper towels. *Id.* at 27.

The injunction found that the Lompoc administrators have "ignored", and "been deliberately indifferent, to the known urgency to consider inmates for home confinement, particularly those most vulnerable to severe illness or death if they contract COVID-19, in failing to make prompt and meaningful use of home confinement and disregarding inmates' age and medical conditions in determining eligibility for home confinement." *Id*. at 34.

### Medical expert Shamsher Samra, MD, opines on medical implications of COVID-19 on Lompoc inmates.

One medical expert upon whom the *Torres* court relied was Shamsher Samra, MD, an Assistant Professor of Clinical Medicine at UCLA in the Department of Emergency Medicine and a clinical physician trained in forensic medical evaluations. Dr. Samra's attached declaration (Exhibit 4) from that case describes conditions at Lompoc, the pandemic's particular impact on inmates housed there, and the dire need for action to reduce suffering and the risk of more death, especially for inmates with particular vulnerabilities.

Among other things, Dr. Samra notes that the Lompoc prison complex is crowded and unsanitary and suffers from a general lack of protective equipment and sanitizers;

inmates are denied the level of medical treatment that was available prior to the outbreak (likely due to shortage of staff and resources). Samra declaration, ¶13. Effective social distancing is out of the question, particularly for those inmates who are effectively forced to be in a communal setting at all times due to their dormitory-style housing. *Id*. at ¶14.

The BOP now contends that a substantial number of the prisoners who recently tested positive have "recovered." To the extent these prisoners have actually recovered from the illness, that does not absolve the need for preventive measures. In particular, it is not yet clear whether people who have been infected develop immunity against future infection by COVID-19. *Id*. at ¶15. If it is true that BOP is classifying prisoners as "recovered" without re-testing them, that would be very problematic. Indeed, the need for continued rigorous preventive measures is only heightened if BOP has not relied on appropriate methods for determining whether prisoners have in fact recovered. In an ideal scenario, an individual would only be deemed "recovered"after testing negative. Relying instead, for instance, on patient reports of symptoms may not be sufficient in a correctional setting, where prisoners may be reluctant to share information with staff. Furthermore, asymptomatic individuals can still be carriers of the disease. *Id*. at ¶16.

Assuming the allegations [of the four petitioners in the class action suit] are accurate, the health care delivery system at Lompoc is failing to provide even the minimal level of acceptable care. In addition to the noted failures to institute an effective regimen of social distancing, these declarations highlight the failure to monitor prisoners

and to treat those who have become infected—and even worse, have displayed notable symptoms. *Id*. at ¶18. The BOP should take immediate steps to dramatically downsize the population at Lompoc, with priority given to those at high risk of harm due to their age and health status and thus are likely to require a disproportionate amount of medical resources. *Id*. at ¶20.

### Mr. Wilson's experiences and observations[5]

Mr. Wilson's anecdotal experiences and observations are consistent with the claims and findings of the class action lawsuit. He reports living in a 55-man "dorm" with adjacent two-tier bunks about four feet apart. Inmates sometimes eat in their dorm after standing in a chow line to receive their meals. They shower in community stalls. The toilet facilities are used by all inmates. He reports that "most inmates" wear masks, which are removed during meal times. The community bathroom often has no hand sanitizer or paper towels. He has noticed black mold "all over the bathrooms" and on the community shower curtain which he estimates has not been cleaned for months. He also observed "6-inch pipes that are leaking feces and urine from above us to the point where it's dripped on people before and it's clearly visible and has a horrible odor." Mr. Wilson's living space is very crowded and has recently become more so: "they just moved an additional

---

[5] This section is based on emails exchanged with Mr. Wilson and on a single phone conversation on June 10, 2020. Other communication with him has been difficult to arrange.

20 people into our dorm making our count about 70 people in a 36' x 72' living space, making it impossible for us to social distance, and we have to eat 2 of 3 meals in there".[6]

He knows other inmates who complained of conditions but they were sanctioned: "the last few guys that were having issues got taken to the SHU or the tents with no running water so I'm kinda scared to say anything."

### Mr. Wilson is diagnosed with Covid-19 virus and remains vulnerable amidst crowded, unsanitary conditions.

During this past spring Mr. Wilson began experiencing tell-tale symptoms of Covid-19.  He lost his sense of taste, smell and appetite. His muscles and head ached and he lost twenty pounds; he lacked the energy to do anything physical or even get out of bed in the morning.  Mr. Wilson finally saw BOP medical personnel in early May 2020 and was diagnosed with the COVID-19 virus on May 8.  BOP medical records[7], p 65.   He received no treatment.  About two weeks later, on May

---

[6] Taking these numbers at face value, 70 people living in a common space measuring 72' x 36' (totaling 2592 square feet) have 2592'/70, or about 37 square feet per inmate.  This is the rough equivalent of a 6-foot-sided square per person.  Only if everyone stood frozen in perfectly spaced formation could the fiction of proper social distancing be realized.

[7] Mr. Wilson's BOP medical records are submitted separately under seal. Exhibit 6.

22, his condition was officially pronounced "resolved".[8] *Id.* at 23. But Mr. Wilson's symptoms remain present and have even worsened since then. He reports chronic fatigue, chest pain, and shortness of breath, especially with exertion. A chart entry on June 8, 2020, reads "COVID+ inmate very concerned about DOE and 'weakness in my legs. I feel like my knees are going to buckle.' . . . Inmate admits to severe anxiety regarding pandemic." *Id*. at 15. "DOE" is medical shorthand for "dyspnea on exertion". "Dyspnea" means shortness of breath. Mr. Wilson's blood pressure has been persistently high. *Id*. at 17. Two recent testings from his chart notes, on July 8, 2020, and June 24, 2020, show readings, respectively, of 153/98 and 163/104, levels that places him near or in the Hypertension Stage 2 category.[9] Other current unresolved ailments include gout, anxiety from PTSD, and "prediabetes", all likely aggravated by the continued stress of incarceration under these conditions. *Id*. at 22.

In a recent communication Mr Wilson said he was experiencing bouts of dizziness, severe fatigue, prostate issues, shortness of breath and chest pains.

---

[8] Following his positive Covid-19 diagnosis on May 8 and for virtually each of the next thirteen days, Mr. Wilson's medical chart notes, p 64-65, contain the curious entry, "Inmate denies cough, SOB, muscle pain, fatigue, sore throat, HA, new loss of taste and smell, and/or chills." Actually, he complained of all those things both before and after this thirteen-day interval and is confident he never denied something he was often feeling. To this day, he experiences SOB (shortness of breath), HA (headaches), muscle pain, lingering loss of smell and taste, chest pain and chronic fatigue.

[9] See hypertension charts from foenix.com. Exhibit 5

**Race and Ethnicity as a Risk Factor**

The CDC has noted that black people are five times as likely to require hospitalization for COVID-19 as whites.[10] The data suggests that Mr. Wilson as a black man is at greater risk than a similarly situated non-minority. *See United States v. Anello*, No. 2:12-CR-00131-RAJ, 2020 WL 3971399, at *5 (W.D. Wash. July 14, 2020) (finding "ample reason to factor in the disproportionate effect upon racial minorities and the societal observations noted by the CDC in analyzing [a] compassionate release request.")

## Argument

**1. Mr. Wilson has exhausted his administrative remedies.**

Mr. Wilson first sought compassionate release from the Lompoc complex warden and received an official response on May 26, 2020, denying his petition. Exhibit 1. This, alone, meets the First Step's administrative exhaustion requirement. Additionally, more than thirty days have passed since his initial request (later denied) before the filing of this motion. See *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. 2020) (waiting thirty days after serving petition on warden is sufficient for exhaustion and, in any event, court may excuse waiting period on equitable (COVID-19) grounds).

**2. The First Step Act authorizes the court to release Mr. Wilson under extraordinary and compelling circumstances if he is not a safety risk.**

---

[10] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html

The First Step Act authorizes the court to modify Mr. Wilson's sentence if warranted by extraordinary and compelling circumstances:

> (c) Modification of an imposed term of imprisonment.— The court may not modify a term of imprisonment once it has been imposed except that —
>
>   (1) in any case—
>
>     (A) the court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions . . .), after considering the factors set forth in §3553(a) . . . , if it finds that—
>
>       (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 USC §3582(c)(1)(A)(i).

### 3. Mr. Wilson's extraordinary and compelling circumstances

The determination of what constitutes "extraordinary and compelling circumstances", a phrase not defined in the statute, is left to the court. But under any reasonable analysis, Mr. Wilson's circumstances surely qualify.

His prior health history is well documented: he is still scarred from a near-fatal car accident that left him with neck and spine fractures and a collapsed lung. He has a debilitating gout condition. Of most concern for Covid-19 purposes are his persistent high blood pressure, his pre-diabetic condition, and his weakened lungs, all conditions that make him particularly vulnerable to the ravages of the

virus.

Unlike many recent petitioners voicing fear of contracting Covid-19, Mr. Wilson actually contracted the virus, experienced pronounced symptoms from it, and fears his recovery is severely hampered by continued exposure to it. Although he was pronounced "resolved", his persistent symptoms of hypertension, chronic fatigue and shortness of breath, that recent medical records document, suggest that he is not resolved at all.

The problem is exacerbated by the overcrowding at FCI Lompoc, the sheer impossibility of appropriate social distancing, and the general inability of a Covid-weakened inmate like Mr. Wilson to have a real chance of healing and full recovery. And as noted above, Dr. Samra could not rule out whether people who have been infected once develop immunity against future infection by COVID-19. Not only is Mr. Wilson saddled with the chronic after-effects of his viral infection, he has no assurance that he won't be re-infected before he can recover from the first infection.

**Other 3553(a) factors.**

Mr. Wilson overcame a difficult childhood (an absent father and alcoholic mother), early brushes with the law, and other very challenging circumstances to become a steady provider for his five children. He single-handedly cared for two of his children when their mother abandoned them and became the chief advocate and protector of another son

14

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

who contracted Hodgkin's lymphoma.  He worked several jobs (warehouse work, oil change technician, Uber-driver and Amazon and grocery delivery driver), sometimes totaling more than 55 hours/week.  Even now, sick from Covid-19 and wasting away in the bowels of FCI Lompoc, he harbors entrepreneurial thoughts, wanting to someday run his own successful business, selling used cars and/or renovating and selling houses.

He has a long (and mostly ancient) history of involvement with the criminal justice system; his last felony conviction before the current offense occurred over fifteen years ago.  He has a 924(c) conviction, but he has never used a firearm to threaten or harm anyone.

If he is fortunate enough to receive a compassionate release he would move into the home of his fiance, Shamikka Russell.  She is employed full-time and has her own apartment in the Seattle area.  Mr. Wilson would be able to focus on regaining his physical health in a clean environment while practicing appropriate social distancing. When his health permitted, and only then in compliance with his release conditions and suitable health safeguards, he would seek appropriate employment to begin supporting his family and children.

## Conclusion

The COVID-19 pandemic has exacted heavy damage on the public at large and many individuals,  particularly those forced to congregate in close quarters, like inmates and staff in jails and prisons.  The virus has personally victimized

Joseph Wilson, an inmate with several health factors that put him at specific risk. Currently, he lies in the belly of the beast — FCI Lompoc — where a high percentage of the inmates and staff has tested positive for the virus, where crowded conditions make reasonable precautions — above-board sanitation and some semblance of social distancing —a practical impossibility.  He continues to experience clear symptoms of the virus and nothing, short of a complete separation from that environment, can begin to bring healing to him and those around him.

His circumstance are extraordinary and compelling and beg for the court's intervention.  His sentence should be modified to time served with the remainder of his present prison term converted to home confinement or supervised release.

Respectfully submitted this 20th day of July, 2020.

/s/ Michael Nance, WSBA #13933
Defense Attorney

Michael Nance
Attorney at Law
P.O. Box 11276
Bainbridge Island, WA 98110
(206) 624-3211

## Certificate of Service

I hereby certify that on the 20th day of July, 2020, I electronically filed the foregoing with the clerk of the court using the CM/ECF system.

/s/ Michael Nance, WSBA #13933
email: michaelnancelaw@gmail.com